UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
PATRICK DELIA,

                     Plaintiff,                         **MEMORANDUM AND ORDER**
                                                 03 CV 3367 (DRH) (AKT)

          - against -

PATRICK R. DONAHOE, Postmaster
General U.S. Postal Service

                     Defendant.[1]
----------------------------------------------------------X
**APPEARANCES:**

**For Plaintiff:**
Daniel F. DeVita, Esq.
377 Oak Street
Suite 203
Garden City, New York 11530

**For Defendant:**
Loretta E. Lynch
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
By:    Kelly Horan Florio, Assistant United States Attorney (Of Counsel)

**HURLEY, Senior District Judge:**

       Plaintiff Patrick Delia commenced this action alleging that his former employer, the

United States Postal Service (the "Postal Service"), violated Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), by discriminating against him based upon his

national origin and by retaliating against him because he filed administrative complaints of

---

     [1]       Patrick R. Donahoe replaced John Potter as Postmaster General on October 25,
2010 and has been substituted as defendant pursuant to Federal Rule of Civil Procedure 25.

discrimination.[2]  Presently before the Court is defendant's motion, made pursuant to Federal Rule

of Civil Procedure 56, for summary judgment.  For the reasons set forth below, defendant's

motion is granted in part and denied in part.

## BACKGROUND

The material facts, drawn from the Amended Consolidated Complaint and the parties'

Local Civil Rule 56.1 Statements, are undisputed unless otherwise noted.[3]

### The Parties

Plaintiff is of Italian national origin.  He began working for the Postal Service in

temporary or training capacities as early as 1975, and became a permanent employee on May 17,

1980.  Plaintiff was originally assigned to work in the JFK postal facility located in Brooklyn,

New York.  As of February 7, 1981, plaintiff's official title was "Maintenance Mechanic, Mail

Processing Equipment" ("MPE mechanic"), and his duties included "breakdown and preventative

maintenance and daily maintenance of mail processing equipment."  (Def.'s 56.1 ¶ 6.)

In addition to JFK, plaintiff worked at, *inter alia*, two other Postal Service facilities: the

Western Nassau Processing and Distribution Center in Garden City, New York ("Western

---

[2]    Between July 2003 and January 2004, plaintiff commenced six separate Title VII actions against defendant.  Those actions were consolidated under this docket number by Order dated March 26, 2004.  The operative pleading is plaintiff's Amended Consolidated Compl. ("Compl."), which was filed on March 3, 2005.  Although plaintiff originally also asserted claims of race discrimination and hostile work environment as well as state law claims for defamation and slander, plaintiff has made clear that he is currently pursuing only his Title VII national origin discrimination and retaliation claims.  (*See* Pl.'s Opp'n at 1 n.1.)

[3]    In his Local Civil Rule 56.1 Statement, plaintiff asserted a "General Objection" as to the authenticity and lack of foundation of many of the documents submitted by defendant in support of its motion.  In its reply memorandum, however, the Postal Service represents that "plaintiff has withdrawn his authenticity objections with respect to all cited documents."  (Reply Mem. at 5.)  Plaintiff has not disputed the accuracy of this representation.

Nassau") between 1989 and 1999, and the Hempstead Main Post Office in Hempstead, New

York ("Hempstead") from 2000 through 2004. Plaintiff retained his MPE mechanic title

throughout this time period. His employment with the Postal Service ultimately came to an end

in April 2004.

Stephen Vertescher served as the Supervisor of Maintenance Operations at Western

Nassau, and as plaintiff's direct supervisor, between January and May 1999. Dominick Brunone

served as the Manager of Maintenance at Western Nassau beginning in July 1998 and he

remained in that capacity as of 1999 when plaintiff left that location. Brunone did not supervise

plaintiff directly, "but rather was separated in the chain of command from the MPE mechanics by

the Supervisors of Maintenance," including Vertescher. (*Id.* ¶ 29.) Dominick Bratta served as

Acting Plant Manager and, later, as Plant Manager of Western Nassau between March and

November 1999. Keith Fischer served as Western Nassau's Acting Plant Manager and, later, as

Plant Manager between November 1999 and at least February 2001. (*Id.* ¶¶ 40-42.)

### The "Dye Date" Incident

As of October 1998, plaintiff's job duties including cleaning out mail processing

machines and changing "dye dates" to ensure that the proper date was stamped on each piece of

mail processed by that machine. On January 8, 1999, plaintiff received a Letter of Warning (the

"First LOW") charging him with two counts of "Failure to Follow Instructions" based upon his

failure to correctly change the dye dates on December 17, 1998, which caused at least 30,000

pieces of mail to be "cancelled" using an incorrect date. (Decl. of Kelly Horan Florio ("Florio

Decl."), Ex. AA.) Plaintiff asserts that even though "at least a half-dozen other employees

shar[ed] responsibility for ensuring that type of error did not occur, only I was charged." (Decl.

of Patrick Delia, dated July 18, 2011 ("Delia Decl.") ¶ 13.)  According to plaintiff, Vertescher issued the First LOW at Brunone's direction.

On January 27, 1999, Vertescher received a Proposed Letter of Warning, signed by Brunone, which stemmed from the same dye date incident and stated: "This proposed letter of warning is being issued to you in lieu of a 7-day time-of suspension."  (Florio Decl., Ex. BB.)[4]

### The May 6, 1999 "Missing in Action" Incident

On May 6, 1999, Vertescher informed plaintiff that Acting Supervisor Michael Lutz had reported plaintiff "missing in action" for a portion of plaintiff's May 3, 1999 shift.  Plaintiff's pay was docked for the time Lutz reported him to be missing.  (Delia Decl. ¶¶ 15-17.)  Plaintiff telephoned Lutz at home that day and, following the conversation, plaintiff believed that any attendance and pay issues had been the result of a miscommunication between supervisors. Plaintiff's pay was, in fact, restored several days later.  (*Id.*)

### Plaintiff's May 7, 1999 Contact with the EEO Office

On May 7, 1999, plaintiff filed a request with the Postal Service's Office of Equal Employment Opportunity ("EEO") for "precomplaint counseling."  (Delia Decl. ¶ 22.)  Plaintiff asserted that Brunone had "unfairly" issued the First LOW and had "baselessly termed [him] a 'high maintenance employee.'" (*Id.*)  Plaintiff claimed that he was being discriminated against because of his "Italian heritage."  (*Id.*)  The EEO acknowledged receipt of plaintiff's request for pre-complaint counseling by letter dated May 20, 1999.  (Delia Decl., Ex. 15; Def.'s 56.1 ¶ 285;

---

[4]        According to the Postal Service, a Proposed Letter of Warning is a "proposal for discipline which would be considered, along with any appeal, by another official."  (Reply Mem. at 14 (citing Florio Decl., Ex. BB at 2).)  The record contains no indication as to whether the "proposal for discipline" set forth in Vertescher's Proposed Letter of Warning was ever accepted by "another official."

Pl.'s 56.1 ¶ 148.)

***Inspector Nater's Investigation Begins***

On May 17, 1999, Brunone wrote a letter to Postal Service Inspector Felix Nater regarding a "Threatening Situation" involving plaintiff.  (Florio Decl., Ex. DD.)  Brunone informed Nater that plaintiff had called Lutz at home in connection with the May 6, 1999 "missing in action" incident, "which resulted in [Lutz] informing [Brunone] that [Lutz] never wanted to act as [plaintiff's] supervisor again."  (*Id.*)  Brunone stated that he "fe[lt] that Mr. Delia's call to [Lutz's] famil[y's] house made [Lutz] feel threatened."  (*Id.*)  Brunone continued:

> After that incident I started hearing stories of several other incidents that occurred before I was on duty at Western Nassau.  These incidents include physical assaults, threats, and spitting in people's faces, all involving this same employee, Patrick Delia . . . [O]f the four people [involved], only one is willing to speak about it.  This individual, Dennis Murphy[,] recounted an incident in which Mr. Delia physically assaulted him.  The other people I spoke to appear frightened to come forward.  In my opinion they are worried for the safety of themselves and their families.
>
> I myself was approached by Mr. Delia in my office [on May 7, 1999] and felt quite uneasy by his demeanor, to the point that I made sure to have someone else (a union official) come into my office rather than be alone with him.  This occurred on a day that Mr. Delia called me from home and got upset on the phone, upset to the point that he drove to work to confront me.

(*Id.*)  Brunone concluded by requesting Nater's assistance.  Subsequently, Nater commenced an investigation into plaintiff's alleged conduct.

Defendant asserts that as part of this investigation, Nater "interviewed witnesses, including plaintiff, and reviewed plaintiff's Official Personnel File and criminal record," and that Nater "followed standard procedure" in conducting his investigation.  (*See* Def.'s 56.1 ¶¶ 130,

131.)  Plaintiff asserts that Nater did not follow "Threat Assessment Standard Operating Procedures" because he failed to interview certain witnesses, took statements only from witnesses "who were favorable to" the Postal Service, distributed copies of plaintiff's criminal record, and failed to take a written statement from plaintiff.  (Pl.'s 56.1 ¶ 131.)

On May 21, 1999, Nater interviewed Dennis Murphy, who recounted an altercation with plaintiff that purportedly took place in 1996.  According to Murphy, plaintiff grabbed Murphy, spilled coffee on him, threw him against a wall, and yelled at him.  (*See* Florio Decl., Ex. II.)[5]  In June 1999, Brunone passed on additional information to Nater: Western Nassau employee George Fuchs had informed Brunone that, on May 6, 1999, plaintiff had asked Fuchs for directions to Lutz's home.  Fuchs reported that he was concerned for Lutz's safety and telephoned Lutz to relay the incident.  (*See* Florio Decl., Ex. JJ.)  Finally, on June 8, 1999, Lutz supplied Nater with a written statement that described, *inter alia*, his eyewitness account of a physical altercation between plaintiff and Jeff Allen that occurred two years earlier, during which plaintiff knocked Allen to the ground.  (Florio Decl., Ex. EE at 2218.)

On July 7, 1999 and July 12, 1999, Nater issued an Investigative Memorandum and Supplemental Investigative Memorandum, respectively, which detailed his investigation into plaintiff's conduct.  In the July 12, 1999 Supplemental Investigative Memorandum, Nater noted that during plaintiff's June 8, 1999 interview, plaintiff had "stated [that] he was arrested twice for

---

[5]     Plaintiff objects that Murphy's written statement, attached to the Florio Declaration as Exhibit II, constitutes inadmissible hearsay.  (*See* Pl.'s 56.1 ¶ 133.)  This statement, however, is not hearsay because the Court is not considering it for the truth of the matter asserted.  That is to say, the Court is not considering the statement as evidence that could prove that plaintiff engaged in physical contact with Murphy on that date in 1996, but only as evidence that he was accused of doing so, and that Nater recorded such accusation as part of his investigation.

DWI and [had] one juvenile arrest for firecrackers" but "that there were no other arrests or convictions to report." (Florio Decl., Ex. FF at 1687.)  However, Nater had uncovered evidence that, contrary to these assertions, plaintiff had been arrested six times between 1972 and 1992 and had been convicted in connection with five of those arrests.[6] (*Id.*)  Furthermore, Nater reported that plaintiff had "failed to explain the convictions" that occurred prior to his employment in his May 1980 Postal Service Application for Employment,[7] and that plaintiff failed to report the arrests and convictions that occurred after his employment commenced.  (*Id.* at 1687-88.)  Plaintiff asserts that at the time he completed his employment application, he was "told by the administrator of the application process" to list felonies on the application and to separately list misdemeanors.  (Pl.'s 56.1 ¶ 176.)  According to plaintiff, he "listed the charges on a separate sheet and handed it in with his application." (*Id.*)

On August 9, 1999, Brunone sent a follow-up memorandum to Nater describing an

_____

[6]   According to Nater's report, plaintiff's arrest and conviction record is as follows: (1) May 27, 1972 arrest on a charge of Possession of Stolen Property, with no disposition information available, (2) July 5, 1974 arrest on a charge of Unlawful Dealing of Fireworks, with a conviction upon a plea of guilty to a charge of Disorderly Conduct, (3) September 5, 1974 arrest on a charge of Possession of Burglar Tools, with a conviction upon a plea of guilty to a charge of Disorderly Conduct, (4) February 14, 1981 arrest on a charge of Criminal Possession of a Controlled Substance and Operating a Motor Vehicle Under the Influence, with a conviction upon a plea of guilty to a charge of Disorderly Conduct and a conditional discharge of the Operating a Motor Vehicle Under the Influence charge, (5) February 13, 1986 arrest on a charge of Operating a Motor Vehicle Intoxicated, with a conviction upon a plea of guilty to that charge, and (6) May 16, 1992 arrest on a charge of Assault with Intent to Cause Physical Injury, with a conviction upon a plea of guilty to that charge.  (Florio Decl., Ex. FF at 1687.)

[7]   Question 18 of plaintiff's employment application asked: "Have you ever been convicted of an offense against the law . . . .?" (Florio Decl., Ex. FF, Ex. 5(c).)  The application stated that the applicant should omit any reference to minor traffic violations or juvenile offenses. The application further stated: "A conviction does not automatically mean that you cannot be appointed.  What you were convicted of, and how long ago, are important.  Give all of the facts so that a decision can be made." (*Id.*)  Plaintiff answered "No" to Question 18.  (*Id.*)

7

encounter he had with plaintiff the prior day.  (Florio Decl., Ex. KK.)  Brunone asserted that, as

he drove away from the office, plaintiff drove up along side of him, partially crossed over into

Brunone's lane (forcing Brunone to drive in the shoulder lane), and yelled profanities at Brunone.

(*Id.*)  Brunone further stated that his parents received a "strange phone call" that night and, based

on the contents of that call, Brunone believed that plaintiff was trying to obtain Brunone's home

address and telephone number.  (*Id.*)  Plaintiff disputes the veracity of Brunone's accusations,

asserting that the "incident[s] never occurred and [were] created by Brunone because he knew the

prior investigation did not contain reliable and truthful evidence of wrongdoing by Delia."  (Pl.'s

56.1 ¶ 139.)  Brunone's accusations were incorporated into two supplemental investigative

memoranda issued by Nater dated August 17, 1999 and September 5, 1999, respectively.

### Plaintiff's Second Letter of Warning

On May 21, 1999, plaintiff was issued a Letter of Warning that charged him with "Failure

to be Regular in Attendance."  (Florio Decl., Ex. MM.)  The Letter of Warning (the "Second

LOW"), signed by Vertescher, listed seven dates between February and May 1999 on which

plaintiff had taken some form of either annual or sick leave.  The Second LOW further stated that

a pre-disciplinary interview was held on May 20, 1999, during which plaintiff "did not provide

any information that would indicate that discipline should not be issued."  (*Id.* at 230.)  Plaintiff

asserts that he "had supervisory approval for each and every absence."  (Pl.'s 56.1 ¶ 148.)

### Plaintiff's June 1, 1999 Referral to EAP Counseling

On June 1, 1999, Brunone referred plaintiff to the Postal Service's Employee Assistance

Program ("EAP").  Brunone indicated that the reasons for plaintiff's referral were

"Misconduct/Disruptive Behavior," "Unsatisfactory Work Performance," and "Work

Relationship."  (Florio Decl., Ex. OO.)  Plaintiff avers that when he arrived for the EAP

interview, the counselor "had no idea why I was there."  (Delia Decl. ¶ 52.)

***Plaintiff's Emergency Placement on Off-Duty Status***

On June 14, 1999, Brunone notified plaintiff in writing that: "[Y]ou are placed in an off-

duty (without pay) status effective 10AM June 14, 1999 and [will] continue in this status until

you are advised otherwise.  The reason for the action is:  Your retention in a duty status may

result in injury to yourself and others."  (Florio Decl., Ex. OO.)[8]  During his deposition, Brunone

testified that his decision to place plaintiff on emergency placement on off-duty status was based

upon the following factors: (1) the May 6, 1999 incident between plaintiff and Lutz, including his

subsequent conversation with Fuchs, after which Brunone concluded that Lutz "could have been

in danger," (2) the prior altercations plaintiff had with Dennis Murphy and Jeff Allen, and (3)

Brunone's own interactions with plaintiff.  (Brunone Dep. at 137, 139.)

Plaintiff asserts that at least one other non-Italian similarly situated employee who

engaged in comparable misconduct was disciplined less severely by Brunone.  Specifically, on

July 15, 1999, Western Nassau Supervisor of Maintenance Operations Jim Mullins became

involved in a verbal altercation with a fellow supervisor about the assignment of a certain

employee.  During the course of the altercation, Mullins pushed the employee towards the other

supervisor and said "you take him."  (Def.'s 56.1 ¶ 275; Pl.'s 56.1 ¶ 273.)  Brunone issued

Mullins a Proposed Letter of Warning in lieu of a seven day suspension on a charge of

Inappropriate Conduct.  (Florio Decl., Ex. LLL.)

---

[8]      Brunone's June 14, 1999 letter was sent to plaintiff by Certified Mail, and was
received by plaintiff that same day.  (Florio Decl., Ex. OO.)

***Plaintiff's 1999 Notice of Removal***

On or about July 30, 1999, plaintiff attended a pre-disciplinary hearing with Brunone,

Labor Relations Specialist George Fredericks, and American Postal Workers Union ("Union")

representatives Jim McCazzio and Joe Hild.  During this hearing, Brunone and Fredericks asked

plaintiff, *inter alia*, about the contents of his employment application.  Plaintiff responded that he

had told the truth on his application and had filled it out as he was instructed.

On August 10, 1999, the Postal Service issued plaintiff a Notice of Removal, effective

September 13, 1999.  The Notice of Removal, which was signed by Brunone and Bratta, set forth

two charges against plaintiff.  (Florio Decl., Ex. H.)  First, plaintiff was charged with "Violation

of the USPS Policy on Acts and Threats of Violence in the Work Place."  The Notice outlined

the May 6, 1999 incident with Lutz, as well as a subsequent conversation plaintiff had with

Brunone, which Brunone perceived to be an attempt to "intimidate [him] from taking any

administrative action against [plaintiff]."  (*Id.* at 224.)  The Notice further stated that plaintiff's

"conduct is aggravated by the fact that [he] had altercations with other employees in the past

including Mr. Dennis Murphy and Mr. Jeffrey Allen."  (*Id.*)  The Notice also set forth that

Nater's background investigation had revealed plaintiff's arrest for (and ultimate plea of guilty

to) a charge of assault in May 1992, which "further indicate[d] [plaintiff's] propensity for this

type of conduct."  (*Id.*)  Finally, the Notice stated that the Postal Service had posted copies of its

"Policy on Acts and Threats of Violence in the Workplace" (the "Workplace Violence Policy")

throughout Western Nassau, and that these postings "indicate that there will be zero tolerance of

acts [or] threats of violence in our workplace."  (*Id.* at 225 (emphases omitted); *see also* Florio

Decl., Ex. IIII.)

10

The second charge in the Notice of Removal was "Failure to List Arrests and Convictions on PS Form 2591 (Application for Employment)."  (*Id.* at 225.)  This charge asserted that plaintiff answered Question 18 of his employment application, which asked whether the applicant has "even been convicted of an offense against the law," by checking the "NO" box even though, as set forth above, plaintiff had at least two prior convictions at that time.  The Notice of Removal, citing both the Employee and Labor Relations Manual Section 666 and the applicable collective bargaining agreement, concluded that plaintiff's submission of false information in his employment application constituted grounds for termination.  Finally, the Notice of Removal stated that plaintiff's First and Second Letters of Warning were considered as part of the decision to terminate his employment.

Plaintiff contends that other Postal Service employees who engaged in similar (or even more severe) misconduct were disciplined in a less severe manner.  For instance, Theodore Lowery, a postal worker at Western Nassau, was involved in a physical altercation with a female employee during the summer of 1999.  According to plaintiff, during that altercation, Lowery grabbed the other employee, pushed her against a sink, and repeatedly grabbed her backside.  (Pl.'s 56.1 ¶¶ 319-22.)  Plaintiff asserts that, although Lowery's conduct violated the Postal Service's zero tolerance Workplace Violence Policy, and despite the fact that Lowery lied to Brunone during his pre-disciplinary hearing, Brunone decided not to terminate Lowery.  (*Id.* ¶¶ 323-27.)  Instead, Lowery was given a Last Chance Agreement and a four-month suspension.  (*Id.* ¶¶ 327-31; *see also* Delia Decl. ¶¶ 82-83.)

***Plaintiff's September 30, 1999 EEO Complaint***

On September 30, 1999, plaintiff filed a formal EEO Complaint alleging disparate

11

treatment and retaliation.  (Florio Decl., Ex. OOO.)  Plaintiff listed the following as the bases for

his complaint: (1) the First and Second Letters of Warning, (2) the May 6, 1999 "missing in

action" incident, (3) plaintiff's June 1, 1999 referral to EAP counseling, (4) Nater's interview of

plaintiff on June 8, 1999, (5) plaintiff's emergency placement on off-duty status without pay, and

(6) plaintiff's termination, which was effective September 13, 1999.

***Plaintiff's 2000 Arbitration Hearing and Decision***

Meanwhile, plaintiff also filed a grievance with respect to the August 10, 1999 Notice of

Removal, and an arbitration hearing was held over four dates in March and May 2000.  Labor

Relations Specialist Fredericks represented the Postal Service during the hearing.  Plaintiff

asserts that as part of Fredericks's closing remarks, Fredericks mentioned plaintiff's father and,

"in an Italian accent, pronounced – and drawn out – pronounced [plaintiff's] father's name[,]

Pasquale."  (Pl.'s Dep. at 479-80.)  Plaintiff further contends that Fredericks "told the arbitrator

that my father taught me how to lie on [a] postal employment application [and how] to lie or be

deceitful during my postal career.  (*Id.* at 476.)  According to plaintiff, Fredericks attempted to

draw an association between plaintiff and his father (individuals of "Italian heritage") and

"criminal activity," although plaintiff acknowledged that Fredericks never made any direct

comments about plaintiff's Italian heritage.  (*Id.* at 478-79.)

On July 6, 2000, Arbitrator Janet McEneaney issued an award in which she determined

that the Postal Service did not have just cause to issue the Notice of Removal for Charge #1,

(violation of the Workplace Violence Policy).  (Florio Decl., Ex. XX at 1.)  By contrast, the

Arbitrator found that the Postal Service did have just cause to issue the Notice of Removal for

Charge #2 (falsification of his employment application).  (*Id.*)  The Arbitrator concluded,

however, that termination was not warranted and converted plaintiff's termination into a suspension without pay beginning on June 15, 1999 and running through the date of his reinstatement.  (*Id.* at 29-30.)  As for reinstatement, the Arbitrator held that plaintiff was "to be returned to an assignment at his present level of grade and pay at a facility in Nassau County other than the facility to which he is presently assigned."  (*Id.* at 32.)  Further, the plaintiff was directed to enter an anger management and treatment program.  (*Id.*)

As part of the award, Arbitrator McEneaney specifically stated: "[I]f the Grievant commits an act which is found to warrant termination or is convicted of another crime, then the Grievant's employment with the Service will be terminated immediately."  (*Id.*)

***Plaintiff's July 12, 2000 Request for EEO Pre-Complaint Counseling***

On July 12, 2000 plaintiff sought EEO pre-complaint counseling with respect to claims that, *inter alia*, Brunone, Fredericks, and Jeffrey Smith, Manager of Labor Relations for the Long Island District, had conspired to discriminate against plaintiff because of his national origin and retaliate against him.  (Florio Decl., Ex. F.)

***Plaintiff's Employment at Hempstead***

As a result of the July 6, 2000 arbitration decision, plaintiff was reinstated to a position at Hempstead on or about August 12, 2000.  Defendant asserts that plaintiff retained the same work grade level and base pay rate as he had at Western Nassau (Def.'s 56.1 ¶ 207), although plaintiff contends that he was "forced to work in duties outside his work grade and job description." (Pl.'s 56.1 ¶ 208.)  According to defendant, there was no mail processing equipment at

Hempstead for the plaintiff to work on,[9] and so plaintiff performed a variety of maintenance duties on an "on call" basis, including repairing and replacing building fixtures, telephone lines, and mailboxes.  (Def.'s 56.1 ¶ 220.)  Plaintiff contends, however, that he was required to "do custodian work, throw out garbage, paint, do cement work, [and] run errands."  (Pl.'s 56.1 ¶ 219.)

### Plaintiff's Denial of Overtime and his November 2000 Request for EEO Pre-Complaint Counseling

Plaintiff alleges that at some point after his reinstatement, his overtime opportunities in Hempstead were eliminated.  (Pl.'s 56.1 ¶ 208.)  Defendant responds that when plaintiff was first assigned to Hempstead, his paycheck was still being charged to the Western Nassau payroll.  (Def.'s 56.1 ¶ 209.)  Although plaintiff received overtime assignments when he began working at Hempstead, at some point he was informed that his overtime requests were no longer authorized because "Western Nassau would not permit it."  (Def.'s 56.1 ¶ 227.)  Accordingly, plaintiff filed a request for EEO pre-complaint counseling on November 16, 2000, alleging that Brunone was behind Western Nassau's decision to deny his overtime opportunities and that Brunone "has been relentless in his pursuit to cause me harm."  (Florio Decl., Ex. QQQ at 925.)

Plaintiff was officially transferred to Hempstead's payroll as of February 14, 2001.  Defendant contends, without citation to evidentiary support, that "[o]nce plaintiff became part of Hempstead's payroll, he began to work overtime again."  (Def.'s 56.1 ¶ 229.)  Plaintiff disagrees

---

[9]      Although defendant admits that the Hicksville Main Post Office ("Hicksville") utilized MPE mechanics at that time, defendant contends that there were no vacancies at Hicksville at the time of the arbitration decision and, even if there were, the Postal Service could not have guaranteed plaintiff a placement in Hicksville because, pursuant to the applicable collective bargaining agreement, any vacancy would have to be filled by an employee with seniority, which plaintiff did not have.  (Def.'s 56.1 ¶¶ 196-200.)

14

and argues that he did not begin receiving overtime assignments again after he filed EEO Complaints in March 2001.  (Pl.'s 56.1 ¶ 229.)

***Plaintiff is Barred From Entering the Western Nassau Facility***

Sometime in January or early February 2001, plaintiff went to Western Nassau to pick up certain equipment.  While at the Western Nassau facility, plaintiff saw Jeffery Allen.  Allen claims that plaintiff assaulted him and spilled a drink on his equipment.  (Def.'s 56.1 ¶ 232.) Plaintiff denies that any such incident occurred.  By letter dated February 6, 2001, plaintiff's supervisor Christine Cervasio informed plaintiff that he was no longer permitted to enter the Western Nassau facility for any reason.  (Florio Decl., Ex. CCC.)

***Plaintiff's March 9, 2001 Formal EEO Complaints of Discrimination***

On March 9, 2001 plaintiff filed two formal EEO complaints of discrimination, which were consolidated by the Postal Service EEO.  (Florio Decl., Ex. RRR.)  Plaintiff alleged that he was discriminated against based upon his national origin and retaliated against for his prior EEO activity, as evidenced by, *inter alia*, the following: (1) the denial of overtime opportunities after his assignment to the Hempstead office, (2) management's failure to respond when a co-worker (presumably Allen) "attempted to provoke an altercation," and (3) the February 6, 2001 letter barring him from the Western Nassau facility.  (*Id.* at 1-2.)

***Plaintiff's March 27, 2001 Referral to EAP Counseling***

Although the July 6, 2000 arbitration award required plaintiff to enroll in an anger-management program within thirty days, apparently neither plaintiff nor the Postal Service took any steps to accomplish this until March 27, 2001, when Smith referred plaintiff to Mary Jo Kalmbach for EAP counseling.  Kalmbach and Smith spoke about plaintiff's treatment sessions.

According to plaintiff, Smith – rather than Kalmbach – was making decisions about how long plaintiff would have to attend the counseling sessions.  (Pl.'s 56.1 ¶ 240.)  Accordingly, plaintiff discontinued attending the EAP sessions and began seeing a private psychologist at his own expense.  (*Id.*)

### Plaintiff's Subsequent EEO Activity

On March 30, 2001, plaintiff filed a request for EEO pre-complaint counseling alleging that Brunone, Smith, and Fischer retaliated against plaintiff by unilaterally referring him to EAP counseling.  (Florio Decl., Ex. TTT.)  On August 27, 2001, plaintiff filed a formal EEO complaint with respect to these issues, which was dismissed on or about October 24, 2001 for failure to state a claim.  Plaintiff's appeal from this dismissal was also denied.[10]

On August 10, 2001, plaintiff again requested EEO pre-complaint counseling, alleging that Smith had retaliated against him for filing his prior EEO complaints by referring him to EAP counseling and then obtaining confidential information about him from his EAP counselor. Plaintiff filed a formal EEO complaint regarding these issues on December 10, 2001.  (Florio Decl., Ex. VVV.)  On May 20, 2002, the EEO dismissed plaintiff's complaint for failure to state

---

[10]     The Postal Service did not supply the Court with any documentation related to plaintiff's August 27, 2001 formal EEO complaint, the dismissal thereof, or any subsequent appeal.  Rather, the Postal Service cites to the declaration of Eriberto Cedeno, who has worked as the Area Manager for EEO Dispute Resolution since 2002.  Cedeno states that "[d]uring the course of [his] employment, [he has] become familiar with certain EEO filings" made by plaintiff, including the August 2001 filing.  (Decl. of Eriberto Cedeno, dated Aug. 6, 2010, ¶ 5.) Plaintiff does not deny any of the factual assertions contained in Cedeno's declaration, but contends that the declaration was not submitted under penalty of perjury.  (*See* Pl.'s 56.1 ¶¶ 299-301.)  On October 14, 2010, Cedeno submitted a second declaration, under penalty of perjury, in which he stated that the contents of his original declaration were true and correct to the best of his knowledge.  (Decl. of Eriberto Cedeno, dated Oct. 14, 2010, ¶ 3.)  Accordingly, the Court will credit the assertions made in the original Cedeno Declaration.

a claim, and plaintiff's appeal from this dismissal was denied.  (Florio Decl., Exs. WWW, XXX,

YYY.)

### The Oklahoma Training Incident

In May 2002, plaintiff attended a training course at the National Center for Employee

Development ("NCED") in Norman, Oklahoma.  The Postal Service has a no-smoking policy

that prohibits smoking in all buildings or office space, and the NCED also has a policy

prohibiting smoking in all NCED facilities, including NCED housing facilities.  Attendees of

NCED training, including plaintiff, were informed that any failure to comply with, *inter alia*, the

no-smoking policy would "subject [them] to discipline procedures, including notification of

home office, immediate removal from training, and possibly investigation by the Postal

Inspection Service."  (Florio Decl., Ex. EEE at ii.)  Plaintiff admits that he smoked during the

training conference, but maintains that he smoked only in designated areas.  (Pl.'s 56.1 ¶ 247.)

Nonetheless, on May 9, 2002, plaintiff received a Room Discrepancy Report from the NCED

Housing Facility, which alleged that facility staff had uncovered evidence of smoking in

plaintiff's room.  (Florio Decl., Ex. FFF.)  On May 16, 2002, the NCED Housing Facility

generated another Room Discrepancy Report stating that facility staff had again discovered

evidence of smoking in plaintiff's room, and had further found that the smoke detector and fire

alarm had been covered with towels.  (Florio Decl., Ex. FFF.)  Plaintiff denies that he ever

smoked in his room or covered the smoke detector.  (Pl.'s 56.1 ¶¶ 248, 252.)

### Plaintiff's Removal From Hempstead

On June 12, 2002, Hempstead Supervisor of Customer Service Tom McGuinness issued

plaintiff a Notice of Removal, which stated that plaintiff's employment with the Postal Service

would be terminated as of July 15, 2002.  (Florio Decl., Ex. III.)  Plaintiff was charged with

"Improper Conduct" and "Failure to Follow Instructions," both of which stemmed from the

NCED Housing Facility's Room Discrepancy reports of evidence that plaintiff had (1) smoked in

his room in the NCED Housing Facility, in violation of Postal Service and NCED policies, and

(2) covered the smoke detector and alarm with towels.  The Notice of Removal further stated

that, in issuing this discipline, the Postal Service had considered his prior suspension for

falsifying his employment application.  (*Id.* at 2701.)

The Notice of Removal was co-signed by Hempstead Postmaster John Evelyn as a

"Concurring Official."  (*Id.*)  Plaintiff asserts that upon his return from Oklahoma, Evelyn told

him that "the whole thing was ridiculous," that he believed plaintiff would only receive a brief

suspension as a result of the charges, and that he (Evelyn) "was following orders" when he

signed the Notice of Removal.  (Pl.'s 56.1 ¶¶ 256, 263.)

Plaintiff asserts that other non-Italian Postal Service employees who violated the Postal

Service's no-smoking policy were not disciplined.  For instance, in 1999, Samuel Johnson, an

African-American now-retired Postal Service employee, was sent to Oklahoma for NCED

training.  In a declaration submitted to this Court, Johnson asserts that while he was there, he was

falsely accused of smoking in his NCED Housing Facility room.  (Decl. of Samuel Johnson,

dated June 29, 2011 ("Johnson Decl.") ¶ 4.)  When Brunone, Johnson's manager at the time, was

informed, he discussed the matter with Johnson, but did not discipline Johnson in any way.  (*Id.*)

Plaintiff also points to Evelyn's deposition testimony, in which he admitted that he had, at

various times, smoked in the Hempstead facility.  (Pl.'s 56.1 ¶ 281.)  Plaintiff asserts that Evelyn

was never disciplined in connection with his violations of the Postal Service's no-smoking

18

policy. (*Id.*) Plaintiff admitted during his own deposition, however, that he did not know if either Johnson or Evelyn had also been accused of covering smoke detectors or fire alarms. (Pl.'s Dep. at 845.)

### Plaintiff's 2002-2003 Arbitration Hearing and Decision

Plaintiff grieved the issue of his removal, and the case proceeded to arbitration. An arbitration hearing was held over four days between December 2002 and November 2003. On the first day of the hearing, in December 2002, plaintiff was arrested on issues unrelated to his employment. Plaintiff asserts that the Postal Service orchestrated the logistics of his arrest so that he would be taken into custody in front of the arbitrator.

On March 31, 2004, Arbitrator Irene Donna Thomas issued an arbitration award denying plaintiff's grievance. Arbitrator Thomas concluded that the Postal Service had "just cause" to discharge plaintiff because "the evidence show[ed] that he violated the employer's no smoking policy AND covered the smoke detector and fire alarm in his hotel room at the employer's training facility." (Florio Decl., Ex. JJJ at 51.) Arbitrator Thomas found that "[b]ecause Arbitrator McEneaney's Award is in the nature of a 'last chance agreement,' I must enforce termination as the penalty . . . ." (*Id.*) Accordingly, plaintiff was officially terminated from the Postal Service in April 2004.

### Plaintiff's EEO Complaint Regarding his Removal

On November 21, 2002, plaintiff filed an EEO complaint alleging that his removal was discriminatory and retaliatory. (Florio Decl., Ex. MMM.) Although the EEO accepted plaintiff's complaint for investigation in April 2003, that complaint was dismissed on February 26, 2004

because plaintiff had commenced the present litigation.[11]

## DISCUSSION

### I.     Legal Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate

where admissible evidence in the form of affidavits, deposition transcripts, or other

documentation demonstrates the absence of a genuine issue of material fact, and one party's

entitlement to judgment as a matter of law.  *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d

712, 716 (2d Cir. 1994).  The relevant governing law in each case determines which facts are

material; "only disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).  No genuinely triable factual issue exists when the moving party

demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all

inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could

find in the non-movant's favor.  *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir.

1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or

other documentation, the non-movant must offer similar materials setting forth specific facts that

show that there *is* a genuine issue of material fact to be tried.  *Rule v. Brine, Inc.*, 85 F.3d 1002,

1011 (2d Cir. 1996).  The non-movant must present more than a "scintilla of evidence,"

*Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting

---

[11]     Plaintiff's other formal EEO complaints, dated September 30, 1999 and March 9, 2001, were also dismissed after this lawsuit was commenced.

*Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court, in considering a summary judgment motion, must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions. *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.' " *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).

Summary judgment is generally inappropriate where questions of the defendant's state of mind are at issue, *Gelb v. Bd. of Elections of the City of New York*, 224 F.3d 149, 157 (2d. Cir. 2000), and should thus be granted with caution in employment discrimination cases. *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000). Nonetheless, "summary judgment remains

available to reject discrimination claims in cases lacking genuine issues of material fact."

*Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994). "The summary judgment

rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate

as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.

1985). "[T]he salutary purposes of summary judgment — avoiding protracted, expensive and

harassing trials — apply no less to discrimination cases than to commercial or other areas of

litigation." *Id.* "When no rational jury could find in favor of the nonmoving party because the

evidence to support its case is so slight, there is no genuine issue of material fact and a grant of

summary judgment is proper." *Gallo*, 22 F.3d at 1224.

## II.     *Plaintiff's Discrimination Claims*

### A.     *Legal Standard*

In *McDonnell-Douglas Corporation v. Green*, 411 U.S. 792, 802-804 (1973), the

Supreme Court first enunciated the now-familiar "burden-shifting" formula used in analyzing

Title VII employment discrimination claims based on indirect or circumstantial evidence. This

standard was further refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S.

248, 252-253 (1981) and *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-511 (1993).


Under *McDonnell-Douglas* and its innumerable progeny, a plaintiff must first establish a

prima facie case of discrimination by showing: "(1) that she was within the protected age group,

(2) that she was qualified for the position, (3) that she experienced adverse employment action,

and (4) that such action occurred under circumstances giving rise to an inference of

discrimination." *Gorzynski*, 596 F.3d at 107. The burden of establishing a prima facie case of

employment discrimination has been described as "modest," *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994), or even "minimal." *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001). It is a burden of production, not persuasion, and involves no credibility assessments. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

If the plaintiff establishes a prima facie case, the burden then shifts to the employer to "articulate some legitimate, nondiscriminatory reason for [the adverse act]." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 499 (2d Cir. 2009) (internal quotation marks omitted). The employer's burden of showing a legitimate non-discriminatory reason for its actions is not a particularly steep hurdle. Federal courts do not have a "roving commission to review business judgments," *Mont. v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir. 1989) (quoting *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 21 n.8 (7th Cir. 1987)), and thus, "[e]vidence that an employer made a poor business judgment generally is insufficient to establish a question of fact as to the credibility of the employer's reasons." *Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988).

Should the employer satisfy its burden, the *McDonnell-Douglas* framework and its presumptions and burdens disappear, leaving the sole remaining issue of "discrimination vel non." *See Reeves*, 530 U.S. at 143. To rebut an employer's proffered non-discriminatory rationale for its actions and withstand summary judgment, a plaintiff must present more than allegations that are "conclusory and unsupported by evidence of any weight." *Smith v. Am. Exp. Co.*, 853 F.2d 151, 154-55 (2d Cir. 1988). "To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." *Meiri*, 759 F.2d at 998. Although

23

intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143.

> **B.**    ***Application to Plaintiff's Discrimination Claims Based Upon the First and Second Letters of Warning, Plaintiff's Temporary Loss of Pay Stemming From the May 6, 1999 "Missing in Action" Incident, and Plaintiff's June 1, 1999 Referral to EAP Counseling***

> **1.    <u>Adverse Employment Actions</u>**[12]

> **a.    *Plaintiff's Temporary Loss of Pay Stemming From the May 6, 1999 "Missing in Action" Incident and Plaintiff's June 1, 1999 Referral to EAP Counseling***

As set forth above, on May 6, 1999 plaintiff learned that he had been docked several hours pay because his Acting Supervisor Lutz believed that he had been "missing in action" for a portion of a prior shift. This was ultimately determined to be an error, and plaintiff's pay was subsequently restored. The Court concludes that this "allegation is the sort of *de minimis* personnel matter that courts have dismissed as not constituting adverse employment actions." *Blake v. Potter*, 2007 WL 2815637, at *6 (S.D.N.Y. Sept. 25, 2007) (finding failure of the Postal Service to pay plaintiff for 1.5 hours of approved leave time did not constitute adverse employment action) (quoting *Neratko v. Frank*, 31 F. Supp. 2d 270, 296 (W.D.N.Y. 1998)); *accord Dobrynio v. Central Hudson Gas & Elec. Corp.*, 419 F. Supp. 2d 557, 564-65 (S.D.N.Y. 2006) ("An employee will no doubt view suspension, for whatever reason . . . ., as an *adverse* employment action. But being suspended for a single day, with no long term consequences whatever, is not an actionable adverse employment action because it is not *material*."); *Miller v.*

---

[12]    With respect to all of plaintiff's discrimination claims, only the third and fourth elements of the prima facie case are in dispute.

*N.Y. City Health & Hosp. Corp.*, 2005 WL 2022016, at *6 (S.D.N.Y. Aug. 22, 2005) ("Courts in this Circuit have held that a delay in transmitting a paycheck is not a materially adverse action under Title VII.").

Moreover, plaintiff's referral on June 1, 1999 to EAP counseling does not constitute an adverse employment action as a matter of law. The Postal Service has proffered uncontroverted evidence that the EAP was "a formal nondisciplinary program designed to assist employees . . . in dealing with their problems . . . that may adversely affect both an employee's job performance and personal life." (Florio Decl., Ex. HHHH at 857.) Moreover, an employee's participation in EAP "is voluntary and will not jeopardize the employee's job security of promotional opportunities." (*Id.* at 858.) Thus, plaintiff's June 1, 1999 EAP referral was not an adverse action. *See Pierce v. Runyon*, 1997 U.S. Dist. LEXIS 7133, at *14 (N.D.Ill. May 14, 1997).

### b.    *Plaintiff's Letters of Warning*

The Postal Service asserts that plaintiff cannot maintain a prima facie case of discrimination as to the issuance of the First or Second Letters of Warning because those warning letters do not constitute actionable adverse employment actions. (*See* Def.'s Mem. at 8 (citing *Blake v. Potter*, 2007 WL 2815637, at *6 (S.D.N.Y. Sept. 25, 2007).) "Negative evaluations alone, without any accompanying adverse consequences are not adverse employment actions." *Pellei v. Int'l Planned Parenthood Found./W. Hemisphere Region, Inc.*, 1999 WL 787753, at *12 (S.D.N.Y. Sept. 30, 1999). Here, however, it is not at all clear that the First and Second LOWs did not have "accompanying adverse consequences." In particular, plaintiff's August 10, 1999 Notice of Removal specifically stated that these Letters of Warning were "considered" as part of the decision to terminate his employment. (Florio Decl., Ex. F at 3.) Thus, a jury would have to

25

determine whether and to what extent plaintiff's First and Second LOWs had "accompanying adverse consequences" for his employment.

### 2.       Inference of Discrimination

With respect to the issuance of his First LOW, plaintiff asserts that even though six other employees were working on his shift at the time the dye date mistake occurred, he was the only one disciplined by Brunone.  Plaintiff has, however, failed to proffer any evidence as to the national origins of these six employees.  *See Goldman v. Admin. for Children's Servs.*, 2007 WL 1552397, at *7 (S.D.N.Y. May 29, 2007) (finding that "'sweeping allegations,' in which plaintiff cannot even identify, and presents no evidence of, the race or national origin of alleged comparators, can not satisfy the similarly situated test").  Plaintiff also argues that although Brunone "issued a 'Proposed' Letter of Warning" to Vertescher, plaintiff's non-Italian direct supervisor, in connection with this incident, this was "a lesser adverse employment action." (Pl.'s Opp'n at 12 n.2; *see also* Florio Decl., Ex. BB.)  The Court finds this evidence sufficient to meet plaintiff's minimal burden at the prima facie stage with respect to the First LOW.

Plaintiff has failed, however, to show that the Second LOW was issued under circumstances giving rise to an inference of discrimination.  Vertescher, not Brunone, issued the Second LOW and plaintiff has not asserted that Brunone had any role in Vertescher's decision to do so.  Moreover, aside from generally disputing the merit of the charges contained in the Second LOW, plaintiff has offered absolutely no evidence that would give rise to an inference of discrimination.

26

3.      **The Postal Service's Legitimate Non-Discriminatory Reason for Issuing the First LOW**

The Postal Service has articulated a legitimate, non-discriminatory reason for issuing the First LOW, i.e., plaintiff's involvement in the dye date mistake. Thus, the Court turns to the "ultimate question" of whether plaintiff has presented evidence which, if accepted by a jury, would permit the conclusion that he "was the victim of intentional discrimination." *Reeves*, 530 U.S. at 146.

4.      **Pretext**

As evidence of pretext with respect to the issuance of the First LOW, plaintiff relies on his assertion that Brunone disciplined Vertescher less severely for his supervisory role in the same dye date incident. Defendant argues that Brunone "did not serve as the final decisionmaker with respect to Mr. Vertescher's discipline," because Brunone issued only a "Proposed" Letter of Warning. (Reply Mem. at 14.) This simply underscores plaintiff's point: although Brunone issued plaintiff a Letter of Warning, Brunone only issued Vertescher a "Proposed" Letter of Warning for his role in the same dye date incident. As noted above, a Proposed Letter of Warning is a "proposal for discipline" to be considered by another official. (Reply at 14.) The Postal Service asserts that Brunone actually "intended to discipline Mr. Vertescher more severely than plaintiff for the December 1998 dye date incident," and that, pursuant to Postal Service policies applicable to supervisory employees, "[a] letter of warning in lieu of a time-off suspension is [ ] a greater level of discipline than a letter of warning standing alone without reference to suspension." (*Id.* at 15.)[13] This is a question of fact that is appropriately resolved by

---

[13]      As support for this assertion, the Postal Service submits a document entitled "Nonbargaining Disciplinary, Grievance, and Appeal Procedures," which is attached to

27

the jury.

Plaintiff has also proffered evidence that, before he received the First LOW the same type of dye date mistake had occurred, but no other Postal Service employee received a warning letter. (*See* Pl.'s Opp'n at 11-12; Decl. of Larry Baronciani, dated June 23, 2011; Delia Decl., Ex. 11 at 36-38.)  The Court finds this evidence sufficient to raise a question of fact for the jury as to whether the Postal Service's articulated reason behind the issuance of plaintiff's First LOW was pretextual.

### C.   Application to Plaintiff's Discrimination Claims Based Upon Irregularities With Nater's Investigation

To the extent that plaintiff can demonstrate that any irregularities in Nater's investigation, as discussed *infra*, constitute actionable adverse employment actions, the Court finds that plaintiff still cannot make out a prima facie case of discrimination as to this claim.  Even though plaintiff has pointed to some record evidence that Nater may not have conducted a perfect investigation,[14] plaintiff has proffered absolutely no evidence that could lead a reasonable juror to conclude that any such irregularities were the product of unlawful discrimination based upon plaintiff's national origin.  Thus, the Postal Service's motion for summary judgment is granted

--------

Brunone's October 14, 2011 Declaration.  Plaintiff has moved to strike this document, claiming that it was never produced during discovery and was not submitted with defendant's moving papers.  Plaintiff's motion is denied.  It was plaintiff – not defendant – who first raised the issue of differential discipline with respect to Vertescher when he made a passing reference thereto in a footnote in his opposition brief.  The Postal Service was entitled to rebut this assertion in its reply.  Moreover, given that the Court finds that this claim should go to the jury, plaintiff has not suffered any prejudice at this point as a result of the Postal Service's belated production of this document.

[14]   Indeed, Arbitrator McEneaney identified problems with Nater's investigation. (*See* Florio Decl., Ex. XX at 27 (noting that "[k]ey witnesses were not interviewed during the official investigation").)

with respect to plaintiff's discrimination claim based upon Nater's investigation.

> **D.      Application to Plaintiff's Discrimination Claims Based Upon his June 1999 Suspension and August 10, 1999 Notice of Removal**

Plaintiff also asserts that his June 14, 1999 emergency placement on off-duty status (effectively, an unpaid suspension) and his August 10, 1999 Notice of Removal were discriminatory.[15]  "Despite the elaborate process set up in *McDonnell-Douglas*, Second Circuit case law makes clear that a court may simply assume that a plaintiff has established a prima facie case and skip to the final step in the *McDonnell-Douglas* analysis, as long as the employer has articulated a legitimate, nondiscriminatory reason for the adverse employment action."  *Idrees v. City of New York*, 2009 WL 142107, at *9 (S.D.N.Y. Jan. 21, 2009) (citing cases); *see, e.g., Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 188 (2d Cir. 2006); *accord Morris v. Ales Grp. USA, Inc.,* 2007 WL 1893729, at *7 (S.D.N.Y. June 29, 2007) ("Rather than apply the *McDonnell Douglas* test formalistically, the Court will assume that [plaintiff] has made out a *prima facie* case of discrimination on this claim."); *Mathews v. Huntington*, 499 F. Supp. 2d 258, 264 (E.D.N.Y. 2007).  Here, the Court assumes that plaintiff has established a prima facie case of discrimination with respect to his June 14, 1999 suspension and August 10, 1999 Notice of Removal.

Further, the Court finds that the Postal Service has articulated legitimate, nondiscriminatory reasons for placing plaintiff in emergency placement on off-duty status and for

---

[15]      The Postal Service does not dispute, and the weight of authority from within this Circuit makes clear, that a plaintiff's unpaid suspension and termination from employment constitute adverse employment actions.  *See Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998); *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001).

issuing the August 10, 1999 Notice of Removal, specifically: (1) plaintiff's alleged violation of the Postal Service's zero-tolerance Workplace Violence Policy, and (2) plaintiff's alleged falsification of his employment application by virtue of his omitting reference to certain of his arrests and convictions on that application form. The Court turns, therefore, to the "ultimate question" of whether plaintiff has presented sufficient evidence from which a jury could conclude that the Postal Service "intentionally discriminated" against plaintiff based upon his national origin. *See Reeves*, 530 U.S. at 146-47.

To defeat the Postal Service's motion for summary judgment, plaintiff bears the "burden to demonstrate that there is a material issue of fact as to whether (1) defendant's asserted reason for [the suspension and Notice of Removal] is false or unworthy or belief and (2) 'more likely than not,' plaintiff's [national origin was] the real reason for the [adverse actions]." *Rommage v. MTA Long Island R.R.*, 2010 WL 4038754, at *8 (E.D.N.Y. Sept. 30, 2010) (quoting *Faldetta v. Lockheed Martin Corp.*, 2000 WL 1682759, at *8 (S.D.N.Y. Nov. 9, 2000)) (alterations added).

### 1.    Plaintiff's Direct Evidence of Discrimination

First, plaintiff points to a remark that Labor Relations Specialist Fredericks purportedly made as part of his closing statement to Arbitrator McEneaney during the 2000 arbitration hearing. According to plaintiff, Fredericks "[using] an Italian accent, pronounced – [in a] drawn out [fashion] – pronounced [plaintiff's] father's name[,] Pasquale," and then stated that plaintiff's father "taught [plaintiff] how to lie on [the] postal employment application [and how] to lie or be deceitful during [his] postal career." (Pl.'s Dep. at 476, 479-80.) Plaintiff does not contend that either he (or his father) speaks with an Italian accent and that Fredericks was attempting to imitate and ridicule such an accent. Rather, plaintiff argues that Fredericks was

30

inviting the Arbitrator to draw an association between people of "Italian heritage" (like plaintiff

and his father) and "criminal activity," although he admits that Fredericks never made any direct

comments about his Italian heritage.  (*Id.* at 478-79.)

It would have been helpful to the Court to review a transcript of the proceedings during

which Fredericks allegedly made this comment, although the Court recognizes the possibility that

no such transcript exists.  All that has been presented is plaintiff's recollection of Fredericks'

closing statement, along with plaintiff's perception of Fredericks' pronunciation of the name

"Pasquale."  In any event, however, plaintiff has produced no evidence that Fredericks was

involved in the decision to suspend plaintiff or to issue the August 10, 1999 Notice of Removal.

Thus, his comment could – at most – be considered a mere stray remark by a non-decisionmaker.

*See Sino v. N.Y. City Bd. of Educ.*, 213 F.3d 626, at *1 (2d Cir. May 1, 2000) ("'Stray remarks by

non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great

weight . . . .'") (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir.

1992)) (alteration in the original).

### 2.    Plaintiff's Evidence Purporting to Show Differential Treatment Afforded to Similarly Situated Employees

In furtherance of his efforts to show pretext, plaintiff asserts that Postal Service

employees Mullins and Lowery, who were involved in physical altercations in the workplace

(which are arguably more serious offenses than acting in a threatening and intimidating manner),

received less severe discipline from Brunone.  "A plaintiff may show pretext by demonstrating

that similarly situated employees of a different [national origin] were treated more favorably."

*Rommage*, 2010 WL 4038754 at *9 (citing *Hargett v. Nat'l Westminster Bank, USA*, 78 F.3d

31

836, 839 (2d Cir. 1996)).

> a.     *Mullins*

The Postal Service contends that Mullins is not an appropriate comparator because plaintiff and Mullins were not similarly situated in "all material respects," as is required under Second Circuit case law.  *See Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999).  The Circuit has recognized that "[w]hat constitutes 'all material respects' [ ] varies somewhat from case to case and . . . must be judged based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000).

The Postal Service asserts that, unlike plaintiff, Mullins was a supervisor at the time of his alleged misconduct.  (*See* Def.'s Mem. at 15) Defendant has not, however, explained why this distinction is relevant.  The Postal Service's Workplace Violence Policy explicitly states that it is applicable to all employees – not just to non-supervisory employees.  (*See* Florio Decl., Ex. IIII.) And the Postal Service has not suggested that supervisory employees were subject to a different set of standards with respect to violence or threatening actions in the workplace.  Thus, plaintiff has proffered evidence that he and Mullins were subject to the same workplace standards.  *See Graham*, 230 F.3d at 40.

Mullins, who physically touched another employee during the course of a verbal altercation, was not charged with a violation of the Postal Service's Workplace Violence Policy. Instead, Brunone charged Mullins with "Inappropriate Conduct" and issued him a Proposed Letter of Warning in lieu of a suspension.  (*See* Florio Decl., Ex. LLL.)  Plaintiff, by contrast,

32

who was alleged to have used intimidating language with Lutz and Brunone, was charged with a violation of the Workplace Violence Policy, placed in emergency placement on unpaid off-duty status, and ultimately issued a Notice of Removal.  (Florio Decl,. Ex. H.)  Given these facts, plaintiff has raised a question for the jury as to whether he received more severe discipline for conduct that was of "comparable seriousness" to Mullins' conduct.

The Postal Service argues, without elaboration, that Mullins is an inappropriate comparator because plaintiff has failed to show that "he and Mullins had similar prior discipline histories."  (Def.'s Mem. at 15.)  It is well-settled that comparators will not be considered "similarly situated" when they do not have comparable disciplinary histories.  *See Rommage*, 2010 WL 4038754 at *9 (collecting cases).  Brunone testified that he based his decision to suspend plaintiff on, *inter alia*, plaintiff's prior altercations with Murphy and Allen.[16]  (Brunone Dep. at 137, 139.)  However, there is no record evidence that plaintiff was ever actually disciplined, formally or informally, in connection with either of these incidents.  Thus, plaintiff's altercations with Murphy and Allen did not give rise to any "disciplinary history" at all; comparatively, Mullins could not have had a more favorable "disciplinary history."

Finally, the Postal Service asserts that the circumstances giving rise to the disciplines meted out to plaintiff and Mullins, respectively, differ markedly and, thus, plaintiff and Mullins are not similarly situated.  (Def.'s Mem. at 15.)  The Court finds that this issue is appropriately resolved by a jury.  *Graham*, 230 F.3d at 39 ("Whether two employees are similarly situated

---

[16]    The other bases of the decision to terminate plaintiff's employment, as set forth in the Notice of Removal were either not known to Brunone at the time he suspended plaintiff (i.e., plaintiff's previous arrest and conviction on a charge of assault) or were not included in the reasons he gave for suspending plaintiff (i.e., plaintiff's First and Second LOWs).

ordinarily presents a question of fact for the jury.") (citing *Taylor v. Brentwood Union Free Sch.*
*Dist.*, 143 F.3d 679, 684 (2d Cir. 1998)).

> b.    Lowery

Plaintiff also asserts that he was similarly-situated to Lowery, and that Brunone
disciplined him more severely than Lowery, who, in July 1999, pushed and repeatedly grabbed a
female employee's backside.  According to plaintiff, Lowery was given a four-month suspension
and a Last Chance Agreement, but was not issued a Notice of Removal.  (Pl.'s 56.1 ¶¶ 327-31.)
Defendant contends that Lowery was, in fact, issued a "Proposed Notice of Removal" based upon
his misconduct, which was also deemed a violation of the Workplace Violence Policy.  (Decl. of
Dominick Brunone, dated Oct. 14, 2011 ("Brunone Decl."), Ex. B.)  According to defendant,
however, as a result of arbitration, Lowery's "removal was modified to a last chance agreement,
which permitted Lowery to remain employed and provided him with a last chance to correct his
behavior."  (Reply Mem. at 16.)  Defendant contends, therefore, that because both Lowery and
plaintiff were suspended and ultimately received "last chance agreements" as a result of their
respective arbitrations, "plaintiff and Lowery received similar treatment."  (*Id.* at 17.)  Defendant
does not address, however, whether and to what extent Lowery's "Proposed Notice of Removal"
differed from plaintiff's "Notice of Removal," nor does it explain whether the former was a less
severe form of punishment than the latter.[17]  Given this, the question of whether plaintiff and
Lowery received comparable discipline for comparable misconduct is appropriately determined
by the jury.

---

[17]    Lowery's Proposed Notice of Removal, signed by Brunone, is a proposal the
Lowery's employment be terminated and states that, after Lowery has a chance to submit
responsive material, the final decision will be made by Bratta.  (Brunone Decl., Ex. B at 2.)

**3.** **Plaintiff's Evidence Purporting to Show That his Suspension and Notice of Removal Ultimately Lacked any Basis**

*a.* *Plaintiff's Suspension*

Plaintiff claims that Brunone's decision to place him in emergency placement on off-duty status and commence an internal investigation, the outcome of which ultimately led to the issuance of his Notice of Removal, was entirely unjustified based upon the facts before Brunone at the time. *See James v. N.Y. Racing Ass'n*, 233 F.3d 149, 156-57 (2d Cir. 2000) (finding that "evidence satisfying the minimal *McDonnell Douglas* prima facie case, coupled with evidence of falsity of the employer's explanation, may or may not be sufficient to sustain a finding of discrimination"; "the test for summary judgment is whether the evidence can reasonably support a verdict in plaintiff's favor"). As noted above, Brunone based his decision to suspend plaintiff on three factors: (1) plaintiff's May 6, 1999 telephone call to Lutz, and the information Brunone subsequently received from Fuchs, (2) plaintiff's prior altercations with Murphy and Allen, and (3) Brunone's own interaction with plaintiff in his office on May 7, 1999. The record is replete with questions of fact as to whether these factors justified Brunone's decision to suspend plaintiff and, ultimately, whether any of the allegations that plaintiff had violated the Postal Service's Workplace Violence Policy were ever substantiated. For example, plaintiff hotly disputes Brunone's account of what Lutz told him transpired during the May 6, 1999 telephone conversation,[18] and maintains that he did not threaten or intimidate Lutz during that telephone call. Plaintiff also disputes Brunone's characterization of the interaction that occurred between them in Brunone's office on May 7, 1999. Indeed, Arbitrator McEneaney ultimately concluded

_____

[18]     Defendant has not presented this Court with any direct evidence, in the form of Lutz's deposition testimony or affidavit, as to exactly what took place during that telephone call.

that, based upon the evidence presented to her, the Postal Service did not have just cause to

terminate plaintiff based upon this charge.[19]

> b.   *Plaintiff's Notice of Removal Based Upon his Falsification of his Employment Application*

Plaintiff acknowledges that the Arbitrator found the second charge lodged against him in

the August 10, 1999 Notice of Removal – i.e., the falsification of his employment application by

failing to list certain of his prior arrests and convictions – was substantiated by the evidence

presented, although plaintiff maintains that the Arbitrator decided the issue wrongly.[20]  Plaintiff

asserts, however, that the fact that "the Postal Service went back and dug up Delia's 20-year old

application" evidences pretext, "especially since to do so conclusively violated the Postal

Service's 2-year document retention policy for applications for employment."  (Pl.'s Opp'n at

25.)  As support for this assertion, plaintiff cites to one page of a multi-page document entitled

"Retention Periods for Post Office Forms" as well as the deposition testimony of Jeffrey Smith,

then a Manager of Labor Relations for the Long Island District, about that document.  (*See* Delia

Decl., Ex. 27.)  Smith testified that, pursuant to the one page of the document shown to him

---

[19]     Arbitrator McEneaney found that Lutz provided conflicting hearing testimony, as well as hearing testimony that contradicted Fuchs's hearing testimony.  She also found that Brunone's account of his interaction with plaintiff on May 7, 1999 was "contradicted by several witnesses . . . ." (Florio Decl., Ex. XX at 27.)  The Arbitrator concluded that, based upon a lack of evidence that plaintiff engaged in the alleged conduct at issue, coupled with certain "irregularities that occurred in the investigation and the grievance procedure," the Postal Service did not have "just cause" to "remove" plaintiff based upon violations of the Workplace Violence Policy.  (*Id.*)

[20]     Plaintiff "has consistently denied that he [falsified his employment application], [and] maintain[s] that the administrator [overseeing his completion of the application] wanted convictions other than felonies listed on a separate sheet," and that he complied with this instruction.  (*See* Pl.'s Opp'n at 24.)

during his deposition, employment applications "[s]hould be retained for two years," and that

"[w]hat happens after two years is it shouldn't be used in a form, any form."  (Smith Dep. at

114.)  This creates a question of fact as to whether the Postal Service's possible failure to abide

by its purported document retention policy evidences that its decision to terminate plaintiff based

upon his alleged misrepresentations on his employment application was a pretext for unlawful

national origin discrimination.

       In its reply papers, the Postal Service has submitted the Declaration of Stephen Yamond,

who has served as the Manager of Human Resources for the Postal Service since March 2008.

Yamond cites to a different document – entitled "Permanent Documents" – as evidence that the

employment application for any individual hired by the Postal Service is required to be

permanently maintained in the employee's Official Personnel Folder.  (Decl. of Stephen

Yamond, dated Oct. 12, 2011 ("Yamond Decl.") ¶¶ 1, 3-6 & Ex. A.)  According to Yamond, the

document relied upon by plaintiff applied to retention requirements for employment applications

submitted by individuals who were ultimately not hired by the Postal Service.  (*Id.* ¶¶ 7-9.)[21]

---

[21]       Plaintiff acknowledges that the document retention policy attached to the Yamond
Declaration was produced during discovery (*see* Pl.'s Oct. 25, 2011 Letter), but moves to strike
Yamond's declaration because (1) his name and opinion were not previously disclosed by the
Postal Service pursuant to Rule 26, and (2) the information contained in his declaration should
have been presented in the Postal Service's moving papers.  Addressing plaintiff's second
argument first, the Court notes that plaintiff raised the issue of defendant's alleged violation of its
document retention policies in its opposition papers and, therefore, it was proper for defendant to
address the issue in its reply submission.  With regard to plaintiff's assertion that Yamond should
have been identified in defendant's Rule 26(a) disclosures, the Postal Service argues that
Yamond did not become "relevant" until the Postal Service needed to address plaintiff's
"incorrect" claim that the Postal Service had violated its document retention policies.  Despite
plaintiff's assertion to the contrary, the mere fact that plaintiff briefly questioned Smith during
his deposition about the Postal Service's policy regarding retention of employment applications
would not automatically put the Postal Service on notice that plaintiff intended to assert that the
Postal Service had violated that document retention policy and that Yamond would be required to

This document does nothing more than create additional questions of fact to be resolved by a jury.

### 4.    Conclusion

Overall, the Court finds that plaintiff has demonstrated the existence of questions of fact as to whether the Postal Service's stated reasons for suspending plaintiff and issuing the August 10, 1999 Notice of Removal were pretextual.  Plaintiff has pointed to evidence that could allow a reasonable jury to determine that Brunone disciplined other non-Italian similarly situated employees in a less severe manner after they committed comparable misconduct.  Plaintiff has also raised questions of fact as to whether plaintiff's suspension and ultimate termination for violating the Postal Service's Workplace Violence Policy, charges initiated and pursued by Brunone, were based upon insufficient and unsubstantiated information, which could show that the Postal Service's stated reasons for his suspension and termination in 1999 were pretextual. Finally, plaintiff has raised factual questions as to whether the Postal Service failed to comply with its own document retention policies by basing the August 10, 1999 Notice of Removal upon plaintiff's alleged falsification of his employment application, which could also evidence pretext. Therefore, the Postal Service's motion for summary judgment as to plaintiff's discrimination claims based upon his suspension and August 10, 1999 Notice of Removal is denied.

### E.    *Application to Plaintiff's Discrimination Claims based Upon his Reassignment to Hempstead and Certain Post-Reassignment Incidents*

Plaintiff also asserts discrimination claims based upon his reassignment to Hempstead (as opposed to Hicksville), the temporary elimination of his overtime assignments after his

---

rebut that assertion.  Thus, plaintiff's motion to strike Yamond's declaration is denied.

reassignment, the Postal Service's February 6, 2001 decision to ban him from entering the

Western Nassau premises, and his referral to EAP counseling in March 2001 (as required by

Arbitrator McEneaney's July 6, 2000 award).  Even assuming *arguendo* that these events

constitute actionable adverse actions, the Court finds that plaintiff has failed to proffer evidence

that would raise a genuine question of fact as to whether these events occurred under

circumstances permitting an inference of discrimination.  Plaintiff has not pointed to any direct

evidence of discrimination, such as disparaging comments.  Nor has he proffered any

circumstantial evidence, such as evidence of differential treatment afforded to similarly situated

non-Italian employees.  Finally, plaintiff has put forth no evidence that Brunone played any role

in the Postal Service's decisions to assign plaintiff to Hempstead, temporarily eliminate his

overtime assignments, ban him from Western Nassau, or refer him to EAP counseling in March

2001.[22]  Therefore, any discrimination claims based upon plaintiff's reassignment to Hempstead,

elimination of overtime, ban from Western Nassau, or referral to EAP counseling in March 2001

are dismissed.

---

[22]        In his Local Rule 56.1 Statement, plaintiff asserts that his "former supervisors at
Western Nassau, who were responsible for the trumped-up violence in the workplace charges
that failed, controlled Delia's pay in Hempstead and were behind the elimination of Delia's
overtime in Hempstead."  (Pl.'s 56.1 ¶ 208.)  As support for this assertion Delia cites to his own
declaration as well as a portion of Smith's deposition testimony.  The cited portion of Smith's
deposition testimony, however, does not support the assertion that Brunone – or any other
supervisor at Western Nassau – controlled the amount of overtime plaintiff received in
Hempstead.  (*See* Smith Dep. at 105 ("The [Hempstead] postmaster agreed to take [plaintiff]
with the provision that [W]estern Nassau pays for him.  The plan manager in [W]estern Nassau
approved that."); *see also id.* at 106 (Q: "The actual hours of overtime would have been assigned
by the Hempstead postmaster or supervisor in charge of Mr. Delia?"  A: "Yes.").)  In short,
plaintiff has pointed to no evidence – aside from his own conclusory assertions – to support his
contention that his "former supervisors at Western Nassau" had any impact on his working
conditions in Hempstead.

**F.**      ***Application to Plaintiff's Discrimination Claims Based Upon the June 12, 2002
Notice of Removal***

With respect to plaintiff's June 12, 2002 Notice of Removal, the Court will assume that

plaintiff has established a prima facie case of discrimination, (*see* Section II.D, above), and finds

that the Postal Service has articulated a legitimate, nondiscriminatory reason for issuing that

Notice of Removal, to wit: plaintiff's violation of the Postal Service's no-smoking policy,

plaintiff's act of covering the smoke detector and fire alarm in his NCED Housing Facility room,

and the fact that Arbitrator McEneaney's award had stated that "'if [plaintiff] commits an act

which is found to warrant termination . . . then the [plaintiff's] employment with the Service will

be terminated immediately.'" (Florio Decl., Ex. III at 2 (quoting Arbitrator McEneaney's July 6,

2000 Award at 32).)

The parties do not discuss the analytical impact of Arbitrator Thomas's March 31, 2004

arbitration award, which concluded that the Postal Service had "just cause" to discharge plaintiff.

The Second Circuit has made clear that:

> In sum, a negative arbitration decision rendered under a CBA does
> not preclude a Title VII action by a discharged employee.  *See
> [Alexander v.] Gardner-Denver [Co.]*, 415 U.S. [36], 45-60, 60 n.21,
> 94 S.Ct. 1011 [(1974)].   However, a decision by an independent
> tribunal that is not itself subject to a claim of bias will attenuate a
> plaintiff's proof of the requisite causal link.   Where, as here, that
> decision follows an evidentiary hearing and is based on substantial
> evidence, the Title VII plaintiff, to survive a motion for summary
> judgment, must present strong evidence that the decision was wrong
> as a matter of fact – e.g. new evidence not before the tribunal – or that
> the impartiality of the proceeding was somehow compromised.

*Collins v. New York City Transit Auth.*, 305 F.3d 113, 119 (2d Cir. 2002).[23]  Here, plaintiff does

_____

[23]      The Second Circuit recognized that this analysis came come into play either in the
context of determining whether plaintiff has shown an inference of discrimination as part of his

not assert that Arbitrator Thomas was anything other than an independent arbitrator.  Moreover, her 51-page decision and award indicates that her determination was made based upon testimony elicited from eleven witnesses over five hearing dates, as well as her review of an extensive paper record.  (*See* Florio Decl., Ex. JJJ at 3-4.)  However, plaintiff challenges the fairness of the hearing, asserting that the Postal Service orchestrated the logistics of his arrest on an unrelated matter so that he would be taken into custody in front of the Arbitrator.  This issue was raised during the hearing by the Union, which urged Arbitrator Thomas "not to draw a negative inference" from plaintiff's arrest.  (*See id.* at 4 (internal quotation marks omitted).)  The Arbitrator addressed the issue at length in her decision:

> The fact of Mr. D'Elia's 'arrest' has no bearing on this case and on my decision.  Even if the employer 'knowingly disturbed [the hearing] and planned' Mr. D'Elia's arrest in advance, this does nothing to help it meet is burden of proof to show that it had just cause to fire Mr. D'Elia for conduct which occurred in Norman, OK. Only the exhibits, evidence adduced and the positions and arguments set forth at the hearing and after the hearing by the parties have been fully considered in the preparation and issuance of this Opinion and its accompanying Award.

(*Id.* at 5 (footnote omitted).)  Plaintiff has made no suggestion that, despite this clear language in the Arbitrator's opinion, his arrest somehow influenced the fairness of the proceeding.  Further, plaintiff has not pointed to any evidence that was not also presented to the Arbitrator during the hearing.  Plaintiff's "termination occurred, therefore, only after a decision, based on substantial evidence, of an undisputely independent, neutral, and unbiased adjudicator that had the power

---

prima facie case or in the context of determining whether plaintiff has satisfied "the subsequent requirement that a proffered legitimate reason for an employment action be shown to be pretextual."  *Collins*, 305 F.3d at 118 n.1 (noting "issues of this nature tend to collapse as a practical matter under the *McDonnell Douglas* framework").

to prevent the termination.  This fact is highly probative of the absence of discriminatory intent in

that termination." *Collins*, 305 F.3d at 119; *see also Hand v. N.Y. City Transit Auth.*, 2005 WL

3453714, at *1 (2d Cir. Dec. 15, 2005) (unpublished); *Halstead v. N.Y. City Transit Auth.*, 2003

WL 22426979, at *2 (2d Cir. Oct. 22, 2003) (unpublished); *Guerrero v. Conn. Dep't of Children*

*& Families*, 315 F. Supp. 2d 202, 209-10 (D.Conn. 2004).[24]

     Furthermore, plaintiff's claims that he was disciplined more severely for violations of the

Postal Service's no-smoking policy as compared to non-Italian Postal Service employees –

namely, Johnson and Evelyn – are not sufficient to evidence pretext *ipso facto*.  Plaintiff has not

shown that he had a comparable disciplinary history to either Johnson or Evelyn.  Pursuant to

Arbitrator McEneaney's decision, plaintiff was operating under what was effectively a "last

chance agreement."  Plaintiff has not demonstrated their either of his purported comparators were

operating under similar circumstances at the time they allegedly violated the Postal Service's no-

smoking policy.  *See Rommage*, 2010 WL 4038754 at *9 (finding evidence of disparate treatment

of purported comparators "insufficient to demonstrate pretext" when "[t]he comparators do not

---

[24]    Arbitrator Thomas's opinion and award are relevant even though plaintiff
apparently did not raise any discrimination or retaliation claims as part of the arbitration
proceeding.  "The relevance" of her decision stems from her "specific findings regarding
[plaintiff's] misconduct and the fact that [the Postal Service] discharged [him] because of this
misconduct   . . . ." *Tomasino v. Mount Sinai Med. Ctr. & Hosp.*, 2003 WL 1193726, at *12
(S.D.N.Y. Mar. 13, 2003) (finding arbitrator's factual findings were "entitled to great weight"
even though the arbitrator did not directly address any claims of discrimination, and noting that
"[i]n *Collins*, the arbitration did not deal with the issue of discrimination, but the Second Circuit
approved use of the arbitral decision on the basis of the thorough and fair examination of the
factual issues regarding the employee's conduct"); *see also Rommage v. MTA Long Island R.R.*,
2010 WL 4038754, at *12 (E.D.N.Y. Sept. 30, 2010) (rejecting plaintiff's argument that "the
arbitration decision [was] wrong as a matter of fact because it did not consider any evidence of
discrimination," and found plaintiff's position to be against the weight of authority from within
this Circuit) (collecting cases).

have disciplinary histories nearly as long or as severe as plaintiff's, which is demonstrated by the fact that most have not had to sign a Last Chance Agreement") (collecting cases); *Padilla v. Harris*, 285 F. Supp. 2d 263, 270 (D.Conn. 2003) ("Prior disciplinary problems may be sufficient to justify differential treatment of otherwise similarly situated employees.")  Nor has plaintiff shown that either Johnson or Evelyn also engaged in what Arbitrator Thomas deemed to be the more serious offense of covering a fire alarm and smoke detector with towels.  (*See* Florio Decl., Ex. JJJ at 50 (finding that plaintiff's "smoking violation, standing alone, was not as serious as the combined misconduct of violating smoking rules <u>and</u> covering the first protective devices") (emphasis in the original).  *See Tomasino*, 2003 WL 1193726 at *14 (finding purported comparators not similarly situated to plaintiff when they did not "commit[ ] the most serious of the infractions for which [plaintiff] was discharged").

Accordingly, defendant's motion for summary judgment is granted with respect to plaintiff's discrimination claims stemming from his June 12, 2002 Notice of Removal.

## III.   *Plaintiff's Retaliation Claims*

### A.      *Legal Standard*

Plaintiff's Title VII retaliation claims[25] are also analyzed using the *McDonnell Douglas*

---

[25]      As one district court within this Circuit has noted: "Although neither the text of Title VII nor that of the ADEA explicitly provide that federal employees may bring suit for retaliation, the Supreme Court has held that retaliation is actionable under the ADEA's federal-sector provision . . . ."  *Sellick v. Agency-Castle Point*, 2010 WL 2813431, at *11 n.25 (S.D.N.Y. July 16, 2010) (citing *Gomez-Perez v. Potter*, 553 U.S. 474, 479 (2008)).  Although neither party has raised the issue, the Court assumes without deciding that the retaliation claims asserted by plaintiff, a former federal employee, are actionable under Title VII.  *See id.*; *cf. Mathirampuzha v. Potter*, 548 F.3d 70, 74 n.3 (2d Cir. 2008) (noting that the Circuit had "previously assumed without analysis that Congress extended Title VII's prohibition on retaliation to the federal sector" and declining to address the issue because the Supreme Court did not reach that question in *Gomez-Perez*).

burden-shifting framework.  *See Collins*, 305 F.3d at 118 (citing *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 465 (2d Cir. 1997)).  "'To make out a prima facie case of retaliation, an employee must show that the employee was engaged in protected activity; that the employer was aware of that activity; that the employee suffered adverse employment decisions; and that there was a causal connection between the protected activity and the adverse employment action.'" *Id.* (quoting *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988)).

Plaintiff bases his retaliation claims on three separate instances of protected activity.

### B.    *Plaintiff's First Retaliation Claim*

#### 1.    <u>Prima Facie Case</u>

First, plaintiff asserts that he "instituted his EEO complaint procedure on or about May 7, 1999" by filing a request for EEO pre-complaint counseling.  (Pl.'s Opp'n at 31.)  Plaintiff's request "was acknowledged by letter from Postal's EEO on May 20, 1999."  (*Id.*)  The next day, May 21, 1999, plaintiff was issued the Second LOW for attendance problems.  Approximately two weeks later, on June 1, 1999, plaintiff was referred to EAP counseling, and two weeks after that, on June 14, 1999, plaintiff was placed on emergency placement in unpaid off-duty status. And on August 10, 1999, approximately three months after he initiated the Postal Service's internal complaint procedure, plaintiff received a Notice of Removal.

The Postal Service does not contest plaintiff's assertion that his May 7, 1999 request for EEO pre-complaint counseling constituted protected activity, i.e., "action taken to protest or oppose statutorily prohibited discrimination."  *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000).  Nor does the Postal Service contest that plaintiff's June 14, 1999 emergency

placement on unpaid off-duty status and August 10, 1999 Notice of Removal are actionable adverse employment actions.  The Postal Service argues, however, that plaintiff's Second LOW and June 1, 1999 referral to EAP counseling did not constitute actionable adverse employment actions that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *See Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61-62, 66 (2006).

The Court agrees that referral to EAP counseling is not an actionable adverse action, for the reasons set forth above.  (*See* Section II.B.1.a.)  With respect to the Second LOW, the Postal Service cites one case for the proposition that a Letter of Warning does not constitute a materially adverse employment action in the context of a retaliation claim.  (*See* Def.'s Mem. at 19.)  This case is distinguishable, however, because the Second LOW was considered as part of the Postal Service's decision to issue the August 10, 1999 Notice of Removal.  *See Simon v. N.Y. City Bd. of Educ.*, 2006 WL 1210959, at *8 (E.D.N.Y. May 2, 2006) (finding disciplinary letters that "ultimately led to plaintiff's termination" "should be viewed as adverse employment actions").  Moreover, the cumulative effect of the Second LOW, plaintiff's June 14, 1999 emergency placement in off-duty status, and the August 10, 1999 Notice of Removal rise to level of "materiality delineated in *Burlington Northern*."  *See Lore v. City of Syracuse*, 583 F. Supp. 2d 345, 367-68 (N.D.N.Y. 2008).

Turning to the causation prong of the prima facie case, plaintiff has pointed to no direct evidence that the Postal Service harbored a retaliatory animus against him.  *See Lomotey v. Conn. Dep't of Transp.*, 2012 WL 642763, at *24 (D.Conn. Feb. 28, 2012) (noting that one way a plaintiff may prove causation is to offer "direct evidence of retaliatory animus such as negative

45

comments from his supervisors regarding his [internal] complaints or prior lawsuits").  Proof of a causal connection, however, may also be demonstrated "indirectly, by 'showing that the protected activity was followed closely by discriminatory treatment, or through evidence such as disparate treatment of fellow employees who engaged in similar conduct.'" *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 474 (S.D.N.Y. 2011) (quoting *DeCintio v. Westchester Cnty. Med. Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987)) (emphases omitted, alterations added).  As set forth at length above, plaintiff has proffered evidence from which a reasonable juror could conclude that two other Postal Service employees, Mullins and Lowery, were similarly situated to plaintiff and were disciplined less severely for comparable misconduct.

Additionally, the Second Circuit has made clear that "a close temporal relationship between a plaintiff's participation in protected activity and an employer's adverse actions can be sufficient to establish causation." *Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002). The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship." *See Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001).  Here, after the Postal Service's EEO acknowledged receipt of plaintiff's request for pre-complaint counseling on May 20, 1999, one day elapsed before plaintiff was issued the Second LOW, approximately three-and-a-half weeks elapsed before plaintiff was suspended, and just under three months elapsed before plaintiff received the August 10, 1999 Notice of Removal.  The Court finds that this temporal proximity is sufficient to allow plaintiff to meet his minimal prima facie burden regarding his retaliation claim.  *See Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 314 (2d Cir. 2005) (citing *Grant v. Bethlehem Steel Corp.*, 622

F.2d 43, 45-46 (2d Cir. 1980)).

### 2. The Postal Service's Articulated Legitimate Non-Retaliatory Reason

The Postal Service has articulated a legitimate, non-retaliatory reason for issuing plaintiff's Second LOW, i.e., plaintiff's absence from work on seven dates between February and May 1999. (Florio Decl., Ex. MM.) And, as set forth above, the Postal Service has articulated a legitimate, non-retaliatory basis for suspending plaintiff and ultimately issuing the August 10, 1999 Notice of Removal: Brunone's concerns that plaintiff had violated the Postal Service's Workplace Violence Policy.

### 3. Pretext

"[O]nce the employer has proffered its non[retaliatory] reason, the employer will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of [retaliation.]" *James*, 233 F.3d at 154. Here, plaintiff not only relies on the temporal proximity between his May 7, 1999 request for EEO pre-complaint counseling and the adverse employment actions, he also has proffered evidence that could demonstrate that similarly situated comparators were disciplined less severely than he (*see* Sections II.B.4 & II.D.2). Further, plaintiff has pointed to record evidence undermining the Postal Service's stated reasons for issuing his Second LOW, i.e., his assertion that he had supervisor approval for each of his absences. Finally, and as set forth above, plaintiff has also raised questions of fact as to (1) whether plaintiff's suspension and ultimate termination for violating the Postal Service's Workplace Violence Policy, charges initiated and pursued by Brunone, were based upon insufficient and unsubstantiated information, and (2) whether the Postal Service failed to comply with its own document retention policies by issuing the Notice of Removal based upon a charge

47

that plaintiff allegedly falsified his employment application.

Thus, the Postal Service's motion for summary judgment dismissing plaintiff's first claim of retaliation is denied.

### C.    Plaintiff's Second Claim of Retaliation

Plaintiff asserts that his reassignment to Hempstead, "where there were no MPE positions and he was forced to perform custodian duties," was done to retaliate against him for filing another request for EEO pre-complaint counseling on July 12, 2000. (*See* Pl.'s Opp'n at 32.) The Court assumes *arguendo* that plaintiff's July 12, 2000 request for EEO pre-complaint counseling constituted protected activity and that his reassignment to a less desirable post constitutes a materially adverse employment action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *See Cruz*, 202 F.3d at 566. Further, the temporal proximity between his protected activity and his August 12, 2000 reassignment is sufficient to permit plaintiff to establish causation.

The Postal Service has asserted a legitimate, non-retaliatory reason for reassigning plaintiff to Hempstead, as opposed to plaintiff's preferred facility in Hicksville.  According to the Postal Service, there were no vacancies at Hicksville at the time and that, even if there was a vacancy in Hicksville, the applicable collective bargaining agreement would have required that the vacancy be filled by an employee with seniority, which plaintiff did not have.  (*See* Def.'s 56.1 ¶¶ 196-200.)

Plaintiff has not met his burden of demonstrating that this proffered rationale was a mere pretext for retaliation.  It is well-settled that the temporal proximity that gives rise to an inference of retaliation, without more, is insufficient to satisfy plaintiff's burden of coming forward with

48

some evidence of pretext.  *Simpson v. N.Y. State Dep't of Civil Servs.*, 166 Fed. Appx. 499, 502

(2d Cir. Jan. 9, 2006) (summary order) (citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759,

770 (2d Cir. 1998)).  Aside from the relatively small time gap between plaintiff's protected

activity and his reassignment, plaintiff offers no evidence that could lead a reasonable juror to

conclude that the Postal Service's articulated rationale is pretextual.  Although plaintiff makes

clear that he disagrees with the Postal Service's stated rationale for placing him in Hempstead

(*see* Pl.'s 56.1 ¶¶ 196-200), he has proffered no evidence that this decision was a pretext for

unlawful retaliation.  Nor does plaintiff cite to any record evidence in support of his assertion that

Arbitrator McEneaney's July 6, 2000 decision "obligat[ed]" the Postal Service to "make sure

[plaintiff] went to Hicksville" in particular, (*see id.* ¶ 197), as opposed to *any* "facility in Nassau

County" other than Western Nassau (*see* Florio Decl., Ex. XX at 32).

Accordingly, the Postal Service's motion is granted as to plaintiff's second retaliation

claim.

### D.      *Plaintiff's Third Retaliation Claim*

Finally, plaintiff asserts that he filed an EEO complaint on May 20, 2002, and that the

Postal Service issued a Notice of Removal on June 20, 2002, a mere four weeks later.  (Pl.'s

Opp'n at 32.)  As an initial matter, plaintiff has pointed to no record evidence that he actually did

file an EEO claim on May 20, 2002.  Based upon the Court's review of the evidence presented,

the only EEO-related activity that occurred on May 20, 2002 was the EEO's dismissal of

plaintiff's December 10, 2001 complaint for failure to state a claim.  (*See* Florio Decl., Ex.

WWW.)  The Postal Service, however, appears to concede that plaintiff did engage in "prior

protected activity [ ] in May 2002," (*see* Reply Mem. at 18 n.11), and so, the Court will assume

*arguendo* that plaintiff did so.

As discussed above, the temporal proximity between plaintiff's protected activity and the June 20, 2002 Notice of Removal (four weeks) is sufficient to establish the causation prong of plaintiff's prima facie case. *See Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988) (finding that a "causal connection [for prima facie case purposes] can be established indirectly by showing that the protected activity was closely followed in time by the adverse action"). As further set forth above, the Postal Service has articulated a legitimate, non-retaliatory rationale for issuing the June 20, 2002 Notice of Removal, to wit: plaintiff's violation of the Postal Service's no-smoking policy and his act of covering the smoke detector and fire alarms in his NCED hotel room.

Plaintiff has failed to come forward with any evidence beyond temporal proximity, which, as discussed above, can give rise to an inference of retaliation for purposes of establishing a prima facie case, is insufficient on its own to satisfy plaintiff's burden of evidencing pretext. Moreover, Arbitrator Thomas concluded, after a thorough and impartial arbitration proceeding, that the Postal Service had just cause to issue the June 20, 2002 Notice of Removal. "[T]he decision by the arbitrator 'is highly probative of the absence of discriminatory intent' and 'will attenuate a plaintiff's proof of the requisite causal link' between the termination and the protected activity." *Rommage*, 2010 WL 4038754 at *16 (quoting *Collins*, 305 F.3d at 119) (dismissing retaliation claim).

Thus, the Postal Service's motion for summary judgment as to plaintiff's third claim of retaliation is granted.

50

## *CONCLUSION*

For the reasons set forth above, the Postal Service's motion for summary judgment is denied as to (1) plaintiff's discrimination claims based upon the First LOW, his emergency placement on unpaid off-duty status, and the August 10, 1999 Notice of Removal, and (2) plaintiff's retaliation claims based upon the Second LOW, his emergency placement on unpaid off-duty status, and the August 10, 1999 Notice of Removal.  The Postal Service's motion for summary judgment is granted in all other respects.  Plaintiff's motion to strike is denied, for the reasons articulated in footnotes 13 and 21, above.

The parties are directed to contact the Court within thirty days of the date of this Order to schedule a final pretrial conference.

**SO ORDERED.**

Dated: Central Islip, New York
     May 23, 2012

                                              /s/
                                    Denis R. Hurley
                                    Unites States District Judge